**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO**

| | |
|---|---|
| _____ ) | |
| WILDEARTH GUARDIANS; DINÉ CARE, and ) | No. _____ |
| CARSON FOREST WATCH                          ) | |
|                                                               ) | |
|                                    Plaintiffs,        ) | |
|              v.                                             ) | **COMPLAINT FOR** |
|                                                               ) | **DECLARATORY AND** |
| BUREAU OF LAND MANAGEMENT, and  ) | **INJUNCTIVE RELIEF** |
|                                                               ) | |
| UNITED STATES FOREST SERVICE,          ) | |
|                                                               ) | |
|                                    Defendants.     ) | |
| _____ ) | |

**PRELIMINARY STATEMENT**

1.      Ozone is an air pollutant, which has been positively linked to asthma, lung disease, heart attacks, and other respiratory ailments.  The most recent scientific evidence also suggests that ozone exposure contributes to premature death.

2.      The limit of allowable ozone concentrations in the air is set by the United States Environmental Protection Agency ("EPA") pursuant to the federal Clean Air Act.  The limit represents that maximum allowable amount of ozone that can be in the air over an 8-hour period and still protect public health.

3.      In 2008, the EPA promulgated a new 8-hour limit for ozone concentrations that superseded the previous limit promulgated in 1997.  The EPA set this new limit as a result of the significant amount of new scientific research demonstrating that serious respiratory and cardiovascular effects occur when humans are exposed to ozone concentrations that are below the limit previously set in 1997.

4.      Air quality monitoring in the San Juan Basin in northwestern New Mexico shows that 8-hour ozone concentrations in the area are often at or above the new ozone standard set by EPA in 2008.  Over the last five years, ozone levels at all three of the air quality monitors in the San Juan Basin have exceeded the new ozone standard on one or more occasions.

5.      In part, the elevated levels of ozone in the San Juan Basin are attributable to the significant amount of oil and gas development that has occurred on Bureau of Land Management ("BLM") and United States Forest Service ("Forest Service") lands over the last decade. Oil and gas development activities, particularly wellhead compressors, emit high levels of ozone precursors that can ultimately lead to increased ozone concentrations in the air.

6.      Despite the acknowledged problems with ozone concentrations in the San Juan Basin, BLM's Farmington Field Office and Forest Service's Carson National Forest recently authorized extensive additional oil and gas development.  This new development will likely contribute to further exceedances of the ozone limit in the San Juan Basin.

7.      In preparing environmental analyses in connection with the authorizations referenced in the preceding paragraph, BLM failed to acknowledge that the EPA recently promulgated a new ozone standard.  Instead, BLM based its environmental reviews of the proposals for expanded oil and gas development on outdated air quality analyses that relied on the 1997 ozone standard.  While the Forest Service acknowledged promulgation of the new ozone standard in its environmental analysis, the agency failed to consider any measures that would lessen the ozone emissions contributed by increased gas development in the Jicarilla Ranger District on the Carson National Forest.

8.      BLM's and Forest Service's analyses of air quality impacts were also legally deficient in other ways.  For example, the agencies failed to consider development alternatives

2

that would have accommodated increased production while minimizing additional ozone emissions into the San Juan County air shed.

9. With this action, Plaintiffs WildEarth Guardians, Diné CARE, and Carson Forest Watch allege that the agency authorizations for increased oil and gas development violate the National Environmental Policy Act, 42 U.S.C. §§ 4321, et seq. ("NEPA"), the Federal Land Policy and Management Act 43 U.S.C. §§ 1701, et seq. ("FLPMA"), the National Forest Management Act, 16 U.S.C. §§ 1600 et seq. ("NFMA"), and the Administrative Procedure Act, 5 U.S.C. §§ 701-706, ("APA").

## JURISDICTION AND VENUE

10. This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 (federal question); § 2201 (declaratory relief); § 2202 (injunctive relief); and 5 U.S.C. §§ 701-706 (APA).

11. An actual and present controversy exists between the parties within the meaning of the Declaratory Judgment Act, 28 U.S.C. § 2201.

12. Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(e) because this is an action against agencies of the United States and because the events or omissions out of which these claims arise took place in New Mexico.

## PARTIES

13. WILDEARTH GUARDIANS is a non-profit conservation organization with offices in Santa Fe, New Mexico, and Denver, Colorado. WildEarth Guardians is dedicated to protecting and restoring wildlife, wild rivers, and wild places in the American West, and to safeguarding the Earth's climate. WildEarth Guardians and its members work to reduce harmful air pollution in order to safeguard public health, welfare, and the environment. WildEarth Guardians and its members have an interest in ensuring that oil and gas development on lands

under the jurisdiction of BLM's Farmington Field Office ("FFO") and the Carson National Forest proceeds responsibly and in a manner that safeguards public health, welfare, and the environment.  WildEarth Guardians has approximately 4,500 members, many of whom live in New Mexico.  WildEarth Guardians members engage in outdoor activities on public lands under the jurisdiction of the FFO and the Carson National Forest.  These members may be forced to curtail their use of public lands administered by the FFO and the Carson National Forest to avoid exposure to increased air pollution resulting from oil and gas development authorized by BLM and Forest Service decisions that are the subject of this action.  To the extent that WildEarth Guardians' members do conduct activities on public lands under the jurisdiction of the FFO, Carson National Forest, and other lands in the San Juan County area, their experience will be harmed and degraded by virtue of the air pollution resulting from the oil and gas development authorized by BLM and Forest Service through the decisions challenged herein.

14.    Diné CARE is a non-profit organization incorporated in the Navajo Nation.  Diné CARE is an all Navajo organization comprised of a federation of grassroots community activists. Diné CARE's goal is empowerment of Navajo communities to defend themselves and to promote sustainable and locally beneficial development based on the life-sustaining principles of Navajo culture.  The organization actively promotes small-scale, value-added industries, decentralized energy production, recycling, and environmental regeneration.  Because of its ability to provide environmental awareness in terms of the unique Navajo culture and language at the grassroots level, Diné CARE has been active in numerous communities, schools, and environments on and outside of the Navajo Reservation.  Many of Diné CARE's members live and work in the San Juan County area, and use public lands including those under the jurisdiction of the FFO.  Those members who live outside San Juan County may be forced to

4

curtail their use of public lands administered by the FFO and other lands in San Juan County to avoid exposure to increased air pollution resulting from oil and gas development on the lease sales that are the subject of this lawsuit.  Those members who live and/or work in San Juan County, however, will not be able to avoid the increased air pollution and will be harmed by the increased air pollution resulting from the oil and gas development authorized by BLM decisions that are the subject of this lawsuit.

15.     CARSON FOREST WATCH is a volunteer citizen group based in Peñasco, New Mexico, that monitors forest management activities on the National Forests of northern New Mexico and southern Colorado.  Members of Carson Forest Watch regularly use and enjoy the natural resources on the Jicarilla Ranger District of the Carson National Forest.  Carson Forest Watch and its members have an interest in ensuring that gas development on the Jicarilla Ranger District proceeds responsibly, in a manner that safeguards public health, welfare, and the environment.  These members may be forced to curtail their use of the Jicarilla Ranger District and surrounding lands to avoid exposure to increased air pollution associated with gas development resulting from the Forest Service decision that is the subject of this lawsuit.  To the extent that Carson Forest Watch's  members do conduct activities on the Jicarilla Ranger District, other lands under the jurisdiction of the Carson National Forest, and other lands in the San Juan County area, their experience will be harmed and degraded by virtue of the air pollution resulting from the gas development on the Jicarilla Ranger District that is authorized by the Forest Service through the decision challenged herein.

16.     WildEarth Guardians, Diné CARE, and their respective members use and enjoy the public lands under the jurisdiction of the FFO for recreational, scientific, aesthetic, spiritual, commercial and other public purposes.  WildEarth Guardians, Diné CARE, and their respective

members also have a substantial interest in ensuring that BLM complies with federal law, including the requirements of NEPA and FLPMA.  WildEarth Guardians, Diné CARE, and their respective members' interests have been, are being, and will continue to be irreparably harmed by BLM's April, July, and October 2008 EAs/FONSIs approving oil and gas lease sales that will further degrade the air quality in the San Juan Basin.

17.      WildEarth Guardians, Carson Forest Watch, and their respective members use and enjoy the Jicarilla Ranger District under the jurisdiction of the Carson National Forest for recreational, scientific, aesthetic, spiritual, commercial and other public purposes.  WildEarth Guardians, Carson Forest Watch, and their respective members also have a substantial interest in ensuring that the Forest Service complies with federal law, including the requirements of NEPA and NFMA.  WildEarth Guardians, Carson Forest Watch, and their members' interests have been, are being, and will continue to be irreparably harmed by the Forest Service's decision authorizing gas leasing on the Jicarilla Ranger District that will further degrade the air quality in the San Juan Basin and significantly impact visibility in Class I wilderness areas.

18.      The BUREAU OF LAND MANAGEMENT ("BLM") is an agency of the United States within the Department of Interior that is directly responsible for carrying out the Department's obligations under statutes and regulations governing oil and gas leasing and development, including NEPA and FLPMA.

19.      The UNITED STATES FOREST SERVICE ("Forest Service") is an agency of the United States within the Department of Agriculture that is directly responsible for administering and managing lands under its jurisdiction in compliance with all pertinent environmental laws, including NEPA and NFMA.

## LEGAL FRAMEWORK

### A.     Applicable NEPA Requirements

20.     NEPA was enacted to ensure that federal projects do not proceed until the environmental effects associated with those projects are completely assessed and analyzed by the proponent federal agency.  See 42 U.S.C. § 4332(2)(C).

21.     NEPA requires the preparation of an environmental impact statement ("EIS") if a proposed federal action has the potential to "significantly affect" the quality of the human environment.  42 U.S.C. § 4332(2)(C); 40 C.F.R. § 1501.4.

22.     When a federal agency is not certain whether an EIS is required, it must prepare an environmental assessment ("EA").  If the EA concludes that the proposed action will not have significant impacts on the environment, the agency may issue a Finding of No Significant Impact ("FONSI") and proceed with the proposed action.  If, on the other hand, the agency concludes that there is the possibility that its action may directly or indirectly cause a significant impact, then it must prepare an EIS.  See 40 C.F.R. §§ 1501.3, 1501.4, and 1508.9.

23.     All NEPA analyses—EISs and EAs—must, inter alia, analyze alternatives to the proposed action as well as the direct, indirect, and cumulative impacts associated with the proposed action.  See 42 U.S.C. § 4332(2), 40 C.F.R. § 1508.9.  The discussion of "alternatives to the proposed action" is the heart of the NEPA process.  42 U.S.C. § 4332(C)(iii) & (E) and 40 C.F.R. § 1502.14.  This discussion is intended to provide "a clear basis for choice among options by the decisionmaker and the public."  40 C.F.R. § 1502.14.  Federal agencies must "[r]igorously explore and objectively evaluate all reasonable alternatives."  Id.

24.     An EIS must include a discussion of methods to mitigate adverse environmental consequences associated with the proposed action.  See 40 C.F.R. § 1502.14(f), 40 C.F.R. § 1502.16(h).

25.     NEPA requires agencies to "[m]ake diligent efforts to involve the public in preparing and implementing their NEPA procedures."  40 C.F.R. § 1506.6(a).

**B.     Applicable FLPMA Requirements**

26.     FLPMA requires BLM to manage public lands "under principles of multiple use and sustained yield, in accordance with the land use plans" developed by BLM.  43 U.S.C. § 1732(a).  Under FLPMA, BLM has the authority to regulate "the use, occupancy, and development of the public lands."  43 U.S.C. § 1732(b).

27.     Any land use authorization by BLM shall "[r]equire compliance with air and water quality standards established pursuant to applicable Federal or State law."  43 C.F.R. § 2920.7(B)(3).

**C.     Applicable NFMA Requirements**

28.     NFMA requires all of the Forest Service's site-specific projects to be consistent with Land and Resource Management Plans ("LRMP") developed by the Forest Service to guide and constrain development on lands under the jurisdiction of the Forest Service.  See 16 U.S.C. §1604(i).

## FACTUAL ALLEGATIONS

**A.     <u>Ozone Levels and Impacts</u>**

29.     Ground-level ozone is a dangerous pollutant which causes a variety of significant adverse impacts to human health.  According to the EPA, elevated levels of ozone have a "causal relationship[] with a range of respiratory morbidity effects, including lung function decrements,

8

increased respiratory symptoms, airway inflammation, increased airway responsiveness, and respiratory-related hospitalizations and emergency department visits." 73 Fed. Reg. 16436, 16443-46 (March 27, 2008). Furthermore, the EPA has stated that the latest scientific evidence on ozone effects "is highly suggestive that [ozone] directly or indirectly contributes to non-accidental and cardiorespiratory-related mortality," including "premature mortality." Id. The EPA has concluded that individuals with asthma are at particular risk from the adverse effects of ozone. Id.

30.     A study of the health effects of ozone in San Juan County by the New Mexico Department of Environmental Health reported that "ambient ozone concentrations are associated with asthma-related medical visits...in San Juan County...Increased ozone [] was associated with increased odds of at least one asthma-related medical visit by 42 %. The study found that when ozone increased by [0.020 ppm] the number of emergency room visits increased by about 34 %."

31.     Oil and gas extraction, processing, transportation, and use contribute to ground-level ozone by emitting the ozone precursors nitrogen oxides ("NOx") and volatile organic compounds ("VOCs").

32.     A 2006 report on ozone precursors prepared for the New Mexico Environment Department "identified natural gas fired compressor engines as the largest source of area source NOx emissions in San Juan and Rio Arriba Counties."

33.     Ozone is a criteria pollutant under the federal Clean Air Act, 42 U.S.C. §§ 7401, et seq. ("CAA"). The CAA establishes a National Ambient Air Quality Standard ("NAAQS") for each criteria pollutant that represents the maximum allowable concentration of each pollutant that can occur in the air and still protect public health. See 42 U.S.C. § 7409.

9

34.     Until recently, the effective NAAQS for ozone was 0.084 parts per million ("ppm") over an 8-hour period.[1]

35.     On March 27, 2008, EPA published a final rule for a new ozone NAAQS that significantly lowered the 8-hour standard to 0.075 ppm.  See 73 Fed. Reg. 16436 (March 27, 2008).  This new ozone standard became effective on May 27, 2008, superseding the prior ozone NAAQS as of that time.

36.     EPA's decision to lower the ozone standard was based on numerous human health studies conducted over the past decade documenting the adverse effects of ozone on public health.  After examining the data from these studies, EPA concluded that "the current [ozone] standard is not requisite to protect public health with an adequate margin of safety because it does not provide sufficient protection and that revision of the current [ozone] standard is needed to provide increased public health protection."  73 Fed. Reg. 16436, 16471 (March 27, 2008).

37.     Ozone concentrations are measured on an hourly basis.  An exceedance of the ozone standard occurs if the average of eight consecutive hourly readings exceeds 0.075 ppm, which is the NAAQS for ozone.  See 40 C.F.R. § 50.15.  While individual exceedances do not constitute a violation of the NAAQS, they do indicate that air quality is so degraded as to be associated with serious public health risks and are strong indicators of a potential for violation of the  NAAQS if left unchecked.

---

[1]  The actual NAAQS for ozone was 0.08 ppm.  Because older air quality monitors were only able to measure ozone concentrations to two decimal places, the EPA employed a "rounding convention" in which it rounded values below 0.085 ppm down to 0.08, so that the ozone NAAQS was effectively 0.084 ppm.  The "rounding convention" is not used in the implementation of the new 0.075 ppm ozone standard.

10

38.     Data currently available on the EPA's website for the three air quality monitors in San Juan County show that over the past five years, all three monitors have recorded one or more exceedances of the new ozone standard.

39.     A violation of the NAAQS occurs when the 3-year average of the annual fourth highest 8-hour ozone concentrations exceeds 0.075 ppm.  See 40 C.F.R. § 50.15.  A violation triggers federal oversight of states, imposition of stringent pollution controls, and signals a serious public health threat.

40.     The 3-year average of the annual fourth highest 8-hour ozone concentration at the Navajo Lake monitor is 0.075 ppm, which is right at the level of the NAAQS.  Further exceedances at the Navajo Lake monitor, or at the other two monitors in the San Juan Basin, are likely to result in a violation of the ozone NAAQS in the San Juan Basin.

**B.     BLM Quarterly Lease Sales**

41.     BLM oil and gas lease sales for lease parcels under the jurisdiction of the Farmington Field Office ("FFO") fall under the purview of the 2003 Farmington Resource Management Plan ("RMP").  The RMP provides for development of 9,942 new oil and gas wells in the planning area over a 20-year period.  Decisions as to which lands are open for leasing and what stipulations can be placed on those leases were made during the land use planning process.

42.     The planning area for the RMP is the New Mexico portion of the San Juan Basin, which includes all of San Juan County, most of McKinley County, western Rio Arriba County, and northwestern Sandoval County.

43.     The 2003 Farmington RMP and the accompanying EIS specifically contemplate and incorporate the superseded effective ozone NAAQS of 0.084 ppm for purposes of analysis and decision-making.  The Farmington RMP and EIS acknowledged that ozone levels in San

11

Juan County were already approaching the then current 8-hour ozone NAAQS based on data from the two air quality monitors in San Juan County.  The EIS admitted that "emissions from projected development would be potentially significant to ambient [ozone] levels" within San Juan County.

44.     Since completion of the Farmington RMP in 2003, a third air quality monitor was installed in San Juan County at Navajo Lake.  That monitor recorded exceedances of the new ozone standard in 2006, 2007, and 2008.

45.     BLM holds competitive oil and gas lease sales on a quarterly basis.  Prior to each sale the BLM State Office sends a list of proposed parcels to each field office where the parcels are located.  When the list is received, field office staff can review the parcels to determine (1) if they are in areas open to leasing, (2) if appropriate stipulations have been included, (3) if new information has become available which might change any analysis conducted during the planning process, (4) if appropriate consultations have been conducted, and (5) if there are special resource conditions of which potential bidders should be made aware.

### 1.     *April 2008 Lease Sale*[2]

46.     At some point prior to the April 2008 lease sale, the BLM FFO prepared an EA to assess the impacts of leasing the parcels under its jurisdiction, and subsequently issued a FONSI authorizing the leasing of 18 parcels.  The FONSI authorizing the April 2008 lease sale stated that the proposed sale conformed with the 2003 RMP, determined that the proposed lease sale would not have significant environmental impacts, and determined that an EIS was not required.

47.     The April 2008 EA considered three alternatives in its 1-page alternatives section. The "No Action" alternative would withdraw all proposed parcels from the lease sale.  The

---

[2]  The following 18 parcels under the FFO's jurisdiction were included in the April lease sale: NM-200804-059 through NM-200804-076.

"Proposed Action" would offer all proposed parcels in the lease sale.  The "Preferred Alternative" selected in the FONSI would withdraw three of the proposed parcels pending further consultations with the Navajo Nation while the remaining parcels would be included in the lease sale.

48.     Insofar as the analysis of air quality was concerned, the April 2008 EA tiered to and incorporated the analyses of the 2003 Farmington RMP and EIS.  The EA also cited 2003 and 2004 air quality monitoring and modeling done by Alpine Geophysics, LLC, Environ International Corporations, Inc. and the New Mexico Air Quality Bureau ("AQB") for San Juan County.  According to BLM, this monitoring and modeling "indicate[d] that projected development [would be] unlikely to elevate ozone concentrations to significant levels for the foreseeable future."  However, all of these analyses were based on the superseded effective ozone standard of 0.084 ppm.

49.     The 2003 and 2004 modeling and monitoring studies cited in the April 2008 EA projected that the San Juan County region would not exceed the ozone standard through December 2007.  The studies did not assess potential violations of the ozone standard after 2007, and did not contemplate that the standard for ozone would become more stringent in the future based on the developing science concerning the causal relationship between elevated ozone levels and public health problems.

50.     On April 1, 2008, WildEarth Guardians and Diné CARE filed a timely protest of BLM's April 16, 2008, oil and gas lease sale for parcels in New Mexico, Oklahoma, and Texas.[3] Given the reduction of the ozone NAAQS to 0.075 ppm, WildEarth Guardians and Diné CARE urged BLM to perform a thorough analysis of the effects of increased ozone and ozone

_____

[3] The lease sales for parcels in Oklahoma and Texas are not at issue in this complaint.

precursors at the lease sale stage, particularly for those parcels included in the FFO's territory.

Specifically relating to the lease sales in the San Juan Basin, WildEarth Guardians and Diné

CARE also provided BLM with data demonstrating that the Navajo Lake[4] ambient air monitor

had recorded exceedances of the new ozone standard in both 2006 and 2007, and that the

ambient air monitors in Bloomfield and Shiprock had recorded ozone concentrations at or just

under the new ozone standard during those same years.  WildEarth Guardians and Diné CARE

also urged BLM to identify and assess available and reasonable alternatives to the proposed

action that would avoid or minimize adverse effects to the environment including imposing No

Surface Occupancy ("NSO") stipulations and giving serious consideration to not leasing any of

the parcels.

      51.     On July 11, 2008, BLM dismissed WildEarth Guardians' and Diné CARE's

protest of the April lease sale.  BLM acknowledged that the EA did not directly address ozone,

but stated that ozone impacts were "indirectly addressed" by the air quality analysis in the 2003

Farmington RMP and FEIS, and that ozone impacts from the April lease sale were within the

range contemplated by those outdated analyses.  Without acknowledging the more stringent

ozone standard recently adopted by EPA and brought to BLM's attention by WildEarth

Guardians' and Diné CARE's protest, BLM acknowledged that "[o]zone levels in the region are

now close to exceeding health-based national standards for outdoor air."  BLM did not address

WildEarth Guardians' and Diné CARE's request for an alternatives analysis that complied with

the requirements of NEPA.

      **2.**      ***July 2008 Lease Sale***[5]

---

[4]  The protest refers to the Navajo Lake monitor as the Blanco monitor.

[5]  The following 9 parcels under the FFO's jurisdiction were included in the July lease sale: NM-200807-034 through NM-200807-042.

52.     At some point prior to the July lease sale, the BLM FFO prepared another EA for the parcels in that lease sale under its jurisdiction, and again issued a FONSI approving the sale.

53.     The July 2008 EA also tiered to and incorporated the analyses of the 2003 Farmington RMP and accompanying EIS, including the cumulative impact analysis for air quality.  The Air Quality section of the EA acknowledged EPA's promulgation of a new ozone standard.  The Air Quality section did not, however, include any analysis of potential impacts from oil and gas development on the region's ozone levels.  The Air Quality section also did not assess whether approval of the leases at issue would lead to an increased frequency of exceedances of the new more stringent ozone standard and increased public health problems in San Juan County.  Like the April EA, the July EA relied on outdated air quality analyses from the 2003 RMP and the 2003 and 2004 air quality studies that were based on the superseded effective ozone standard.

54.     The July EA also provided a very brief 1.5-page description of three alternatives that were the same as those in the April EA.  The "Preferred Alternative," which was selected in the FONSI, would withdraw two of the proposed parcels pending further consultations with the Navajo Nation while the remaining parcels would be included in the lease sale.

55.     On July 1, 2008, WildEarth Guardians[6] filed a timely protest of BLM's July 16, 2008, oil and gas lease sale for parcels in New Mexico, Oklahoma, and Texas.  WildEarth Guardians again urged BLM to perform a cumulative impact analysis of the effects of increased ozone and ozone precursors at the lease sale stage for those parcels included in the FFO's territory.  Reminding BLM of the ozone exceedances for the Navajo Lake air monitor first raised in the April protest, WildEarth Guardians also presented data demonstrating that the Navajo

---

[6]  Diné CARE was not a party to the July protest.

15

Lake air monitor had, since April, recorded additional exceedances of the new ozone standard. WildEarth Guardians further noted that the other two air quality monitors in San Juan County had recently recorded 8-hour ozone values that were just under the new ozone standard. WildEarth Guardians also again urged BLM to perform an alternatives analysis that would comply with the requirements of NEPA.  Lastly, WildEarth Guardians objected to BLM's failure to involve the public in the NEPA process for oil and gas lease sales.

56.     On October 24, 2008, BLM issued a written dismissal of WildEarth Guardians' protest of the July lease sale.  Using the same boilerplate language as the dismissal of the April protest, BLM acknowledged that the EA did not directly address ozone, but stated that ozone impacts were "indirectly addressed" by the air quality analysis in the 2003 Farmington RMP and accompanying EIS, and that ozone impacts from the current lease sale are within what was contemplated by those documents.  BLM yet again failed to acknowledge the new ozone standard recently implemented by EPA.  BLM also failed to address the air quality impacts of future development of the leases in light of this lower standard and in light of the most recent studies regarding the relationship between elevated ozone levels and public health.

### 3.     *October 2008 Lease Sale*[7]

57.     In August 2008, the BLM FFO prepared another EA for the parcels in that lease sale under its jurisdiction, and again issued a FONSI approving the sale.

58.     The October 2008 EA also tiered to and incorporated the analyses of the 2003 Farmington RMP and accompanying EIS, including the cumulative impact analysis for air quality.  The Air Quality section of the EA does not mention the new ozone standard, nor does it discuss current ozone levels in San Juan County.  Like the April and July EAs, the October EA

---

[7] The following 7 parcels under the FFO's jurisdiction were included in the October lease sale: NM-200810-025 through NM-200810-031.

relied on outdated air quality analyses from 2003 and 2004 that were based on the superseded ozone standard.

59.     The October EA analyzed two alternatives in its 1-page alternatives section.  Like the EAs for the two previous lease sales, the "No Action" alternative would withdraw all proposed parcels from the lease sale.  The "Preferred Action" would offer seven parcels for oil and gas leasing.

60.     On October 7, 2008, WildEarth Guardians and Diné CARE filed a timely protest of BLM's October 22, 2008, oil and gas lease sale for parcels in New Mexico, Oklahoma, Texas, and Kansas.  For the third time, WildEarth Guardians and Diné CARE urged BLM to perform a cumulative impact analysis of the effects of increased ozone and ozone precursors at the lease sale stage for those parcels included in the FFO's territory.  WildEarth Guardians and Diné CARE also presented data demonstrating that the Navajo Lake air monitor had recently exceeded the new ozone standard on more than one occasion, and that the two other monitors had recorded 8-hour averages that were close to or right at the limit imposed by the new standard.  Finally, WildEarth Guardians and Diné CARE again urged BLM to perform an alternatives analysis that would comply with the requirements of NEPA.

61.     On October 7, 2008, WildEarth Guardians and Diné CARE also filed an addendum to their protest of the October lease sale to the BLM State Director objecting to BLM's failure to involve the public in the NEPA process for oil and gas lease sales.

62.     On December 10, 2008, BLM issued a written dismissal of WildEarth Guardians' and Diné CARE's protest of the October lease sale.  Using the same boilerplate language as the dismissals of the April and July protests, BLM yet again failed to acknowledge the new ozone standard recently implemented by EPA, or consider the air quality impacts of future

17

development of the leases in light of this lower standard.  BLM did not address WildEarth

Guardians' and Diné CARE's request for an alternatives analysis that complied with the

requirements of NEPA or comment on the agency's failure to involve the public in the NEPA

process at the lease sale stage.

### 4.     *Facts Common to Each of the Three Lease Sale EAs and FONSIs*

63.     The April, July, and October EAs contained the same boilerplate language

regarding potential impacts to ozone levels from oil and gas development.  BLM did not address

the new more stringent ozone standard, did not consider post-2004 data from the three air

monitors in San Juan County, and did not consider the most recent scientific information

regarding the effects of elevated ozone levels on public health in making its determination that

the lease sales would not significantly impact air quality in the County.

64.     All three EAs also use boilerplate descriptions of the same three alternatives—

leasing none of the parcels, leasing all of the parcels, or leasing most of the parcels with the

exception of those for which tribal consultation has not been completed—and fail to provide any

meaningful analysis of the different environmental impacts of the alternatives.

65.     The EAs also failed to analyze other available and reasonable alternatives that

would have appreciably lesser impacts on air quality.  For example, the EAs did not consider

conditioning the lease sales on the lessees' implementation of onsite air pollution control

measures such as best available control technology for ozone emissions.

66.     Neither the EAs nor the FONSIs for the April, July, and October lease sales were

circulated to the public either prior to or following the lease sales.  Instead, the EAs were

prepared as internal documents only. BLM provided no notice to the public that the EAs had

been prepared or were available for public review, or that BLM had issued FONSIs.  WildEarth

Guardians obtained the EAs and FONSIs for the lease sales only through requests submitted

pursuant to the Freedom of Information Act, 5 U.S.C. § 552 ("FOIA").

67.     The leases challenged herein were issued without No Surface Occupancy

stipulations.  Accordingly, BLM no longer possesses the discretion to prohibit future

development of these leases.

68.     The San Juan Basin has a long history of prolific oil and gas production.

69.     There is a high likelihood that the leases issued in the April, July, and October

sales will be developed.

**C.     Carson National Forest EIS and Record of Decision**

70.     The 1986 Carson National Forest Land and Resource Management Plan

("LRMP") governs all resource management actions in the Jicarilla Ranger District of the Carson

National Forest.  Pursuant to the express requirements of NFMA, all site specific decisions for

the use and development of resources on the Carson National Forest, including oil and gas

development in the Jicarilla Ranger District, must be consistent with the Carson National Forest

LRMP.  See 16 U.S.C. § 1604(i).

71.     The Jicarilla Ranger District of the Carson National Forest is located in northwest

New Mexico within the San Juan Basin, about 50 miles east of Farmington.  The District is

comprised of 153,000 acres, approximately 97 percent of which are currently leased and

producing natural gas.  As of January 2006, there were 647 active wells on the District.

72.     The Federal Onshore Oil and Gas Leasing Reform Act ("FOOGLRA") outlines

an 8-step process[8] for oil and gas leasing of federal minerals on Forest Service lands.  Under the

---

[8]  The eight steps are: (1) leasing analysis; (2) leasing decision; (3) verification; (4) BLM
assessment; (5) sale by the BLM; (6) issuance of lease; (7) application for permit to drill; and (8)
application for permit to drill to develop a field. Steps 1, 2, and 3 represent the responsibilities of
the Forest Service in the leasing process; The Forest Service enters the process again at Step 7, as

FOOGLRA, Forest Service and BLM share responsibility for the issuance of leases on forest lands.  See 30 U.S.C. § 226(h).  The Forest Service is responsible for implementing those portions of the lease that require lessees to conduct operations in a manner that minimizes adverse impacts to surface resources and other land uses and users.

73.     At Step 2, the "leasing decision" stage, the Forest Service identifies specific parcels for leasing, performs specific environmental review on those parcels, and determines whether to authorize the BLM to lease those parcels.  See 36 C.F.R. § 228.102(e).  At Step 3, the "verification" stage, the Forest Service verifies that the leasing was adequately addressed in a NEPA document and is consistent with management plans, ensures that conditions of surface occupancy have been included as stipulations in the lease, and determines that operations and development could be allowed somewhere on the lease (unless stipulations prohibit all surface occupancy).  See 36 C.F.R. § 228.102(e).

74.     In 2008, the Carson National Forest issued a Final EIS for surface management of gas leasing and development on all lands within the Jicarilla Ranger District currently leased for mineral extraction and all parcels for which a leasing decision had not been made.  The Forest Service described the scope of the EIS as both a "programmatic-level forest plan analysis and a project-level leasing analysis."  On July 25, 2008, Acting Carson National Forest Supervisor Erin Connelly signed the ROD adopting Alternative B, as analyzed and assessed in the EIS.

75.     The EIS analyzed four alternatives, including the No Action alternative, for management of gas development on the Jicarilla Ranger District.

76.     The selected alternative ("Alternative B") proposed to open 5,000 unleased acres for drilling, provide criteria to determine what stipulations should be required on new leases,

FOOGLRA requires Forest Service approval of a Surface Use Occupancy Plan before BLM may issue a permit to drill. 30 U.S.C. 226(g).

recognize five new areas of resource concern, amend the LRMP to incorporate new standards and guidelines for mineral management, and "encourage", although not require, use of unconventional drilling techniques.

77.     Alternative B (the selected alternative) would result in development of 751 new wells on the Jicarilla Ranger District.  For the EIS, the Forest Service chose to consider the environmental impacts from the maximum number of wells that could be developed on the District, rather than limit its analyses to site-specific impacts from the smaller number of wells that could be developed on the 15 parcels encompassed by the 5,000 unleased acres.

78.     According to the EIS, the Forest Service chose to analyze a maximum development scenario because

> "[a] cumulative effects analysis would further expedite gas development in accordance with the [Energy Policy Act of 2005 ("EPAct")], by providing an analysis of drilling as reasonably foreseeable activity in a developed field.  The [Jicarilla Ranger] [D]istrict will be able to apply category 3 of section 390(b)(3) of the [EPAct] to ensure timely action on applications for permits to drill in compliance with NEPA and EPAct."

79.     By framing its analysis of the impacts of gas development as one that takes into account development of the maximum number of wells as a reasonably foreseeable activity, the Forest Service can, pursuant to Section 390 of the EPAct, approve future drilling activities at any and all of the 751 potential new wells in the District without conducting any analyses of site-specific impacts.  See 42 U.S.C. § 15942.

80.     The 1986 Carson National Forest LRMP requires the Forest Service to plan its activities "so that air quality will be equal to or better than that required by the applicable Federal, State and/or local standards and regulations."  The federal ozone NAAQS is a federal air quality standard.

21

81.     The EIS shows that exceedances of the current 8-hour ozone standard occurred in 2003, 2005 and 2006 at the San Juan Substation (Shiprock) monitor.  In 2003 and 2006, exceedances occurred at the Bloomfield monitor.  In 2006, eceedances occurred at the Navajo Lake monitor.  Additional exceedances occurred at the Navajo Lake monitor in 2007 and 2008.

82.     Despite the LRMP requirements that Forest Service actions be planned to insure compliance with federal air quality standards, and despite the Forest Service's admission in the Jicarilla EIS that "[s]ince the area is near the non-attainment level for 8-hour [ozone] concentrations, the impact of the new district emissions would be significant to ambient [ozone] levels," the Forest Service authorized significant new leasing and development in the San Juan Basin.

83.     Alternative B (the selected alternative) would result in development of 751 new wells.  The 2008 EIS for gas leasing and development in the Jicarilla Ranger District states that

> "[a] review of emissions estimated for gas production from the development of 751 new wells shows that the emissions of VOC and NOx would...contribute to an increase in [ozone] emissions from current levels in the region.  Since this area is near the non-attainment level for 8-hour [ozone] concentrations, the impact of the new district emissions would be significant to ambient [ozone] levels."

84.     The 1986 Carson National Forest LRMP requires the Forest Service to manage resources under its jurisdiction in such a manner that "Class I air quality areas in the Wheeler Peak Wilderness maintain high quality visual conditions."

85.     The 2008 EIS states that "oil and gas development on the Jicarilla Ranger District would impair visibility in nearby Class I areas, and that existing sources in the region [] may already be affecting visibility."  The EIS goes on to say that [v]isibility impacts in Class I areas due to emissions from proposed new gas production sources, as estimated in this analysis would be significant if left unmitigated."

22

86.     Class I areas under the federal Clean Air Act ("CAA") include national wilderness area greater than 5,000 acres in size.  See 42 U.S.C. § 7472.  The CAA allows almost no air quality degradation in Class I areas, and Class I areas also receive stronger protections with respect to visibility.  See 42 U.S.C. § 7475 and 74 U.S.C. § 7491.

87.     The air quality analysis in the EIS fails to provide a legally adequate discussion of mitigation measures to reduce impacts to San Juan Basin air quality and visibility in Class I wilderness areas[9] that would result from implementing the ROD.  Nowhere has the Forest Service provided the required discussion regarding the implementation or anticipated effectiveness of proposed mitigation measures.

88.     The EIS included the blanket statement that any new wells developed on the Jicarilla Ranger District would be required to comply with lower NOx emission standards for wellhead compressors developed by the Four Corners Air Quality Task Force.  This mitigation measure, however, is not included in the ROD and therefore there is no such enforceable requirement in place.

89.     The single air quality mitigation measures specified in the ROD to protect visibility in nearby Class I areas is a general statement that "all newly developed facilities will utilize the air quality mitigation as set forth by the New Mexico Air Quality Bureau."  Such mitigation for protection of visibility, however, does not exist in the State's regulations.

90.     On February 9, 2009, WildEarth Guardians and Carson Forest Watch timely appealed the ROD, which was reissued on December 18, 2008.  The appeal alleged that the Forest Service has violated NEPA and NFMA in several respects, provided several exhibits

---

[9]  The FEIS includes the following as nearby Class I wilderness areas:  Weminuche Wilderness, San Juan National Forest in southwest Colorado and San Pedro Parks Wilderness, and Santa Fe National Forest in north-central New Mexico.

23

demonstrating the seriousness of the air quality issues in the region and potential mechanisms for

lowering emissions from gas production, and requested that the Forest Service prepare a legally

adequate analysis of potential impacts from gas development.

91.     On March 19, 2009, the Forest Service affirmed the ROD.

### CLAIMS FOR RELIEF

**First Claim for Relief:
BLM's Violation of NEPA – EAs and FONSIs Are Legally Inadequate
(Failure to Fully Analyze Direct, Indirect, and Cumulative Impacts)**

92.     Plaintiffs incorporate by reference all the preceding paragraphs.

93.     NEPA requires federal agencies to take a "hard look" at the environmental

consequences of their actions.  42 U.S.C. § 4332.  NEPA's implementing regulations require

BLM to consider and assess the direct and indirect impacts of its lease sales, as well as the

cumulative environmental impacts of the lease sales when added to other past, present, and

reasonably foreseeable future actions.  See 40 C.F.R. §§ 1508.25(c)(3) and 1508.7.

94.     The EAs and FONSIs for the April, July, and October 2008 quarterly lease sales

are legally inadequate because they failed to analyze the direct and indirect impacts of the lease

sales, and failed to analyze the cumulative impacts of all past, present, and reasonably

foreseeable oil and gas lease sales, and other activities and development, on the air quality in San

Juan County, including particularly the impact of such development on ozone levels in light of

the new federal ozone standard.

95.     BLM's approvals of the April, July, and October 2008 quarterly lease sales on the

basis of legally inadequate EAs and FONSIs that failed to fully analyze direct, indirect, and

cumulative impacts of the lease sales were arbitrary and capricious and constitute a violation of

NEPA and the APA, 5 U.S.C. § 706(2)(A).

24

**Second Claim for Relief:**
**BLM's Violation of NEPA – EAs and FONSIs Are Legally Inadequate**
**(Failure to Analyze a Reasonable Range of Alternatives)**

96.     Plaintiffs incorporate by reference all the preceding paragraphs.

97.     NEPA and its implementing regulations require BLM to include in EAs "reasonable alternatives" to a proposed action that will avoid or minimize the action's adverse effects on the quality of the human environment.  42 U.S.C. §§ 4222(C)(iii) & (E), 40 C.F.R. §§ 1500.2(e), 1502.14, and 1508.9(b).

98.     BLM failed to analyze any alternative that would prevent or minimize further degradation to San Juan County air quality from development of the leases offered in the April, July, and October sales.  For example, BLM failed to consider reducing the number of leases offered based on the amount of ozone precursor emissions that could be expected from lease development and production activities, or to consider any alternative requiring the use of technological controls that would reduce such emissions.

99.     BLM's approvals of the April, July, and October 2008 quarterly lease sales on the basis of legally inadequate EAs and FONSIs that failed to analyze a reasonable range of alternatives were arbitrary and capricious, and constitute a violation of NEPA and the APA, 5 U.S.C. § 706(2)(A).

**Third Claim for Relief:**
**BLM's Violation of NEPA - An EIS Must Be Prepared**

100.     Plaintiffs incorporate by reference all the preceding paragraphs.

101.     NEPA requires preparation of an EIS if a federal action has the potential to "significantly affect" the environment. 42 U.S.C. § 4332(2)(C) and 40 C.F.R. § 1501.4.

25

102.    When evaluating significance, NEPA and its implementing regulations require BLM to evaluate, inter alia, "[w]hether the action threatens a violation of Federal, State, or local law or requirements imposed for the protection of the environment."  40 C.F.R. § 1508.27(b) (10).

103.    BLM's approvals of the April, July, and October 2008 quarterly lease sales are major federal actions that may significantly affect the quality of the human environment because they will likely result in ozone emissions that exceed federal air quality standards, and because they will likely lead to increased ozone levels that will have significant adverse public health impacts.

104.    Accordingly, BLM's decisions not to prepare EISs before approving the April, July, and October 2008 lease sales were arbitrary and capricious, and in violation of NEPA and the APA, 5 U.S.C. § 706(2)(A).

**Fourth Claim for Relief:**
**BLM's Violation of NEPA - BLM Failed to Involve the Public in the NEPA Process**

105.    Plaintiffs incorporate by reference all the preceding paragraphs.

106.    NEPA and its implementing regulations require the BLM to involve the public, to the extent practicable, in preparing EAs, and to provide public notice of the availability of EAs. See 40 C.F.R. §§ 1501.4(b) and 1506.6.

107.    BLM did not provide notice to the public that it was preparing EAs for the lease sales, did not provide any information about potential environmental impacts of the lease sales to the public, and did not provide any opportunities for the public to comment on the potential environmental impacts of the lease sales.

26

108.    BLM did not make any draft or final lease sale EAs and/or FONSIs available for public comment or public review in a timely fashion.

109.    BLM's failure to provide for public participation in the NEPA process defeated one of the central purposes of NEPA, which is to assure better public decisionmaking through public review and participation.

110.    BLM's failure to involve the public in any way in the NEPA process for the April, July, and October lease sales, including its failure to timely provide WildEarth Guardians and Diné CARE with the EAs and/or FONSIs for the lease sales, is a violation of NEPA and the APA, 5 U.S.C. § 706(2)(A), because BLM was required to make diligent efforts to involve the public in the NEPA process.

**Fifth Claim for Relief:**
**BLM's Violation of FLPMA – Failure to Comply With Air Quality Standards for Ozone**

111.    Plaintiffs incorporate by reference all the preceding paragraphs.

112.    FLPMA's implementing regulations require that each land use authorization made by BLM shall require compliance with federal air quality standards established pursuant to applicable federal law.  See 43 C.F.R. § 2920.7(b)(3).

113.    The ozone NAAQS is a federal air quality standard designated pursuant to 42 U.S.C. § 7408.

114.    In all three lease sale EAs, BLM determined that the proposed lease sales would not significantly impact the region's air quality based on outdated air quality modeling from 2003 and 2004 that considered air quality impacts from oil and gas leasing under the superseded effective ozone standard of 0.084 ppm.

115.    BLM ignored available ozone data demonstrating a history of exceedances of the new ozone standard at all three air quality monitors in San Juan County over the last five years.

116.    BLM's failure to provide for compliance with federal air quality standards for ozone prior to authorizing the lease sales violates FLPMA and its implementing regulations, and is arbitrary, capricious and contrary to law in violation of the APA, 5 U.S.C. § 706(2)(A).

**Sixth Claim for Relief:**
**Forest Service's Violation of NEPA – EIS Is Legally Inadequate**
**(Failure to Analyze a Reasonable Range of Alternatives)**

117.    Plaintiffs incorporate by reference all the preceding paragraphs.

118.    NEPA and its implementing regulations require the Forest Service to include in EISs "reasonable alternatives" to a proposed action that will avoid or minimize the action's adverse effects on the quality of the human environment.  42 U.S.C. § 4222(C)(iii) & (E), 40 C.F.R. §§ 1500.2(e), 1502.14, and 1508.9(b).

119.    The Forest Service failed to analyze any alternative that would prevent or minimize further degradation to San Juan County air quality from development of new leases on 5,000 additional acres of the Jicarilla Ranger District and development of existing leases on the District.  For example, the Forest Service failed to consider stipulations requiring use of specific technologies known to reduce emissions of ozone precursors and timing stipulations limiting activity during the smog season.

120.    The Forest Service did not consider any alternatives that would make available for leasing less than all of the 5,000 currently unleased acres.

121.    The Forest Service's approval and adoption of Alternative B on the basis of a legally inadequate EIS that failed to analyze a reasonable range of alternatives was arbitrary and capricious, and constitute a violation of NEPA and the APA,  5 U.S.C. § 706(2)(A).

28

**Seventh Claim for Relief:**
**Forest Service's Violation of NEPA – EIS Is Legally Inadequate**
**(Failure to Adequately Analyze Air Quality Impacts)**

122.     Plaintiffs incorporate by reference all the preceding paragraphs.

123.     NEPA requires federal agencies to take a "hard look" at the environmental consequences of their actions.  42 U.S.C. § 4332.  NEPA's implementing regulations require the Forest Service to consider and assess the direct and indirect impacts of gas leasing and development, as well as the cumulative environmental impacts of such development when added to other past, present, and reasonably foreseeable future actions.  See 40 C.F.R. §§ 1508.25(c)(3) and 1508.7.

124.     Additionally, NEPA's implementing regulations require that an EIS discuss means to mitigate adverse environmental consequences.  Mitigation includes, but is not limited to, avoiding, minimizing, rectifying, or compensating for adverse project impacts to the environment.  See 40 C.F.R. § 1508.20.

125.     The air quality analysis presented in the EIS is legally inadequate because it failed to analyze the direct and indirect effects of gas leasing and development, and failed to analyze the cumulative impacts of all past, present, and reasonably foreseeable gas leasing and development, and other activities and development, on the air quality in San Juan County.

126.     The air quality analysis presented in the EIS is also legally inadequate because it failed to analyze and prescribe any specific mitigation measures or lease stipulations that would limit visual impacts to nearby Class I areas caused by emissions from gas production activities undertaken pursuant to the ROD.

127.     The Forest Service's approval and adoption of Alternative B on the basis of a legally inadequate EIS that failed to provide an adequate analysis of air quality impacts,

29

including but not limited to an adequate analysis of reasonable mitigation measures, was

arbitrary and capricious, and constitutes a violation of NEPA and the APA, 5 U.S.C. § 706(2)

(A).

**Eighth Claim for Relief:**
**Forest Service's Violation of NFMA – The ROD Is Inconsistent With the Carson Forest**
**Plan**
**(Failure to Ensure Protection of Visual Conditions in Class I Wilderness Areas)**

128.    Plaintiffs incorporate by reference all the preceding paragraphs.

129.    The Carson Forest Plan requires that the Forest Service maintain high quality

visual conditions in Class I air quality areas in the Wheeler Peak Wilderness.

130.    The FEIS's visibility analysis for Class I areas suggests that the proposed gas

development on the Jicarilla Ranger District will impair visibility in nearby Class I areas.

131.    The Forest Service violated NFMA and has acted arbitrarily and capriciously by

failing to ensure protection of visual conditions in Class I wilderness areas as required by the

Carson Forest Plan.  See 16 U.S.C. § 1604(i) and 5 U.S.C. § 706(2)(A).

**Ninth Claim for Relief:**
**Forest Service's Violation of NFMA – The ROD Is Inconsistent With the Carson Forest**
**Plan**
**(Failure to Ensure Compliance with Ozone NAAQS)**

132.    Plaintiffs incorporate by reference all the preceding paragraphs.

133.    The Carson Forest Plan requires the Forest Service to plan its activities to ensure

that air quality will be equal to or better that the federal ozone NAAQS.

134.    Although the Forest Service recognizes that new gas development on existing and

new leases authorized by the ROD would significantly impact ozone levels in the region, the

Forest Service fails to require any mitigation to ensure that new gas development authorized by

the ROD will not cause or increase any violation of the federal ozone NAAQS.

135.    The Forest Service's failure to ensure that its approval and adoption of Alternative

B will maintain the ozone NAAQS was arbitrary and capricious, and constitutes a violation of

NFMA and the APA.  See 16 U.S.C. § 1604(i) and 5 U.S.C. § 706(2)(A).

### PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that the Court:

A.    Declare that BLM's actions are in violation of NEPA and FLPMA, and their

implementing regulations, as set forth above;

B.    Declare unlawful and set aside BLM's decisions approving the April, July, and

October 2008 quarterly lease sales until such a time as BLM has complied with NEPA and

FLPMA;

C.    Adjudge and declare that BLM FFO's EAs and FONSIs for the April, July, and

October 2008 quarterly lease sales are arbitrary and capricious and contrary to law; and vacate

said EAs and FONSIs as invalid;

D.    Enjoin execution of the April 2008, July 2008, and October 2008 lease sales, and

any oil and gas activities on the lease parcels included in said lease sales, including issuance of

permits to drill, until such a time as BLM has complied with NEPA and FLPMA, and prepared

EISs to analyze the direct, indirect, and cumulative impacts of such sales;

E.    Declare that the Forest Service's actions challenged herein are in violation of

NEPA and NFMA, and their implementing regulations, as set forth above;

F.    Declare unlawful and set aside the Forest Service's Record of Decision approving

adoption of Alternative B until such a time as the Forest Service has complied with NEPA and

NFMA;

G.     Enjoin issuance of any new leases on the 5,000 acres of the Jicarilla Ranger District covered by the Record of Decision;

H.     Enter such temporary, preliminary, or permanent injunctive relief as specifically prayed for by Plaintiffs hereinafter;

I.     Award Plaintiffs their reasonable fees, costs, expenses, and disbursements, including attorneys' fees, associated with this litigation pursuant to the Equal Access to Justice Act, 28 U.S.C. § 2412(d), and any other applicable statutes; and

J.     Grant such additional and further relief as the Court may deem just and appropriate.


Dated:  April 29, 2009                    Respectfully submitted,

                                          /s/ Samantha Ruscavage-Barz
                                          WildEarth Guardians
                                          312 Montezuma Avenue
                                          Santa Fe, New Mexico  87501
                                          Tel. 505-988-9126 x1158
                                          Fax: 505-989-8623
                                          sruscavagebarz@wildearthguardians.org

                                          /s/ Steven Sugarman
                                          Belin & Sugarman
                                          618 Paseo de Peralta
                                          Santa Fe, New Mexico  87501
                                          Tel.: 505-983-1700
                                          Fax: 505-983-0036
                                          sugarman@bs-law.com

                                          /s/ Melissa Hailey
                                          WildEarth Guardians
                                          1536 Wynkoop St., Suite 301
                                          Denver, CO  80202
                                          Tel: (505) 988-9126 x1159
                                          Fax: (505) 989-8623
                                          mhailey@wildearthguardians.org